UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| US AIRWAYS, INC. | ) | Case No. 04-13819-SSM |
| | ) | Chapter 11 |
| Debtor | ) | |
| | ) | |
| US AIRWAYS, INC. | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Adversary Proceeding No. 06-1146 |
| | ) | |
| DOROTHY RUGGIERO | ) | |
| | ) | |
| Defendant | ) | |

**MEMORANDUM OPINION**

Before the court are cross-motions of the reorganized debtor, US Airways, Inc., and a former employee, Dorothy Ruggiero, for summary judgment on the debtor's objection to Ms. Ruggiero's claim in the amount of $486,337.49 for benefits under a long-term disability plan and on the debtor's counterclaim to recover $79,941.90 in benefits that were paid to Ms. Ruggiero from 1999 to 2003.

<u>Background</u>

The parties agree that the claim objection and counterclaim may be decided on a *de novo* review of a stipulated record consisting of the documents (referred to by the parties as the "administrative record") available to the plan administrator when it retroactively terminated Ms. Ruggiero's benefits, supplemented by a declaration of Ms. Ruggiero concerning the benefits she

1

received.[1]  The salient facts may be briefly set forth as follows.  Ms. Ruggiero was hired by US

Airways as a flight attendant in 1985 and worked for the airline in that capacity until August 6,

1999, when she was placed on medical leave after being diagnosed with cervicalgia, a neck

sprain, and brachial neuritis, which left her unable to work as a flight attendant due to the

jostling and G forces experienced during flight.  The examining physicians did clear Ms.

Ruggiero for light duty/sedentary work.  Her annual salary prior to being placed on leave was

$26,504.   She applied for benefits under the Flight Attendant Long Term Disability plan (the

"plan" or "LTD plan") sponsored by the company under its collective bargaining agreement with

the Association of Flight Attendants.  The application form she signed and submitted contained

the following language:

> I, Dorothy Ruggiero, acknowledge that I have been advised by US Airways
> that while on a medical leave of absence and/or long term disability I am not
> allowed to engage in other employment without written consent from US
> Airways.
>
> If permission is granted by US Airways, I acknowledge that long term
> disability benefits paid to me will be offset based on the provisions of the Plan.
>
> If found engaged in other employment without prior permission of US
> Airways, I understand that I will be deemed to have resigned from the
> Company.  All funds previously paid to me for disability, while I was engaged

---

[1]Courts apply an abuse of discretion standard when an ERISA plan gives the plan administrator
or fiduciary discretion to interpret plan terms and determine eligibility for benefits.  *Firestone
Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 956-57, 103 L. Ed. 2d 80
(1990).  An abuse of discretion standard is inappropriate, however, when a plan administrator
fails to follow proscribed plan procedures.  *Cerra v. Harvey*, 279 F. Supp. 2d 778, 782-83 (D. W.
Va. 2003).  Section 6.1 of the LTD plan gives US Airways, as the plan administrator, the
discretion to make decisions regarding claims for benefits, but US Airways concedes that the
plan administrator failed to follow proper plan procedures when it denied Ms. Ruggiero's timely
request for an appeal of the decision terminating her benefits under the plan.  USA/Ruggiero
020, 046-47, 145.  Consequently, the court must use a *de novo* standard of review.

in outside employment, will be restored to US Airways immediately.[2]

The company, as plan administrator, approved benefits in the amount of $1,821 per month retroactive to November 4, 1999.  After learning that Ms. Ruggiero was taking classes to become a paralegal, the company sent her a letter on June 26, 2002 reminding her that she needed to obtain approval from US Airways before engaging in any outside employment while receiving disability benefits.  Ms. Ruggiero requested and received approval in March 2003 to work as a paralegal title researcher.  The company then required Ms. Ruggiero to provide copies of her tax returns for 1999 through 2002.  Those returns showed that she had worked as a physical therapist in 1999 and 2000 and as a title searcher in 2001 and 2002.[3]  On September 10, 2003, the administrator of the LTD plan informed Ms. Ruggiero that, based on the information in the returns and on the report of a private investigator US Airways had hired, the administrator was recommending to the company's Inflight Services division that she be deemed to have resigned in August of 1999 (the date when she first engaged in other employment without permission from US Airways).  On September 30, 2003, Inflight Services directed Ms. Ruggiero to provide a written statement addressing why she engaged in outside employment without permission.  In her October 9, 2003 response, Ms. Ruggiero explained that the acknowledgment

---

[2] In her motion for judgment on the administrative record, Ms. Ruggiero asserts that the signed acknowledgment is not part of the administrative record and the court is therefore precluded from considering it.  Dft. Mot. for J. on the Admin. R., 14-15. The court disagrees. The signed acknowledgment is in the Joint Stipulated Administrative Record submitted to the court at USA/Ruggiero 005.1.

[3] For the partial year subsequent to November 4, 1999, the pro-rata gross earnings from outside employment were $422.  For 2000 through 2002, the gross earnings from outside employment were, respectively, $677, $4,017, and $21,141.  The net income after claimed business expenses is shown as a loss for each of the years except 2002.

3

she signed as part of her disability application did not give specific instructions regarding pre-disability outside employment and that she interpreted the language to mean only that she needed to seek permission before engaging in post-disability outside employment.  The company notified Ms. Ruggiero on November 4, 2003, that under the terms of section 20.J.3 of the 1993 US Airways Flight Attendant Agreement[4] she was "deemed" to have resigned as of September 12, 1999 based on her failure to obtain approval for her massage/physical therapy employment while on medical leave.  The plan administrator then terminated her benefits and demanded that she immediately repay the $79,941.90 she had received over the prior four years.  Ms. Ruggiero's appeal to the Flight Attendant Retirement Board was denied on November 18, 2003 on the stated ground that she was no longer a participant in the LTD plan once her employment was (retroactively) terminated effective September 12, 1999, and consequently was not entitled to a review of Inflight Services's decision.

Ms. Ruggiero responded by filing suit against US Airways in the United States District Court for the District of Connecticut.  That suit was pending when, on September 12, 2004, US Airways, together with its parent holding company and several affiliates, filed a voluntary

---

[4] The parties agree that the Flight Attendant Agreement is not part of the administrative record, although section 20.J.3 (the authenticity of which is not disputed) was submitted as an exhibit to Ms. Ruggiero's motion for summary judgment on the administrative record.  US Airways asserts that the plan administrator did not rely on the Flight Attendant Agreement to terminate Ms. Ruggiero's benefits. Rather, it was Inflight Services that relied on the Flight Attendant Agreement to retroactively terminate Ms. Ruggiero's employment, which in turn, US Airways argues, required that the plan administrator terminate her benefits because she was no longer a participant under the LTD plan.  Putting aside the subtlety of the argument that derivative reliance is somehow different (in conception, if not in result) from direct reliance, the court finds that section 20.J.3 of the Flight Attendant Agreement is indeed part of the administrative record because it was quoted by US Airways in a November 4, 2003 letter to Ms. Ruggiero from an Inflight Services supervisor, and that letter is part of the administrative record.  USA/Ruggiero 043-045.

petition for reorganization under chapter 11 of the Bankruptcy Code, thereby staying the

litigation in the District Court.  A Joint Reorganization Plan was confirmed on September 16,

2005.  Ms. Ruggiero timely filed a proof of claim (Claim No. 2753) in the amount of

$486,377.49 for the benefits she would have received through age 65.   The debtor objected to

Ms. Ruggiero's claim and filed the present adversary proceeding asserting a counterclaim for

recovery of the benefits it had paid her.

<u>Discussion</u>

I.

The issues to be decided are (1) whether Ms. Ruggiero has standing to bring this claim

under the LTD plan when she was deemed to have resigned and therefore, as US Airways

argues, was not a participant as defined in the LTD plan; (2) whether the acknowledgment

language on the back of the disability benefits application conditioning other employment on

securing permission from US Airways was part of the LTD plan, and, if so, (3) whether Ms.

Ruggiero's termination based on her failure to comply with the language in the acknowledgment

justified termination of her disability benefits; and (4) whether US Airways was entitled to

retroactively terminate Ms. Ruggiero such that she may now be required to reimburse US

Airways for the four years of disability benefit payments she received.

II.

US Airways has raised standing as a threshold issue.  The company argues that, because

Ms. Ruggiero was (many years after the fact) "deemed" to have resigned on September 12, 1999,

she was not a participant as defined in the LTD plan when she applied for disability benefits on

September 23, 1999 and, consequently, she does not satisfy the standing requirements under the

Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 (2006) ("ERISA") to bring

this claim.  US Airways cites to cases from the eighth, ninth, and tenth circuits stating that the

relevant test for determining ERISA standing is the current participant status of the claimant at

the time the civil action is filed, not at the time of the alleged ERISA violation.  *Adamson v.

Armco, Inc.*, 44 F.3d 650, 654 (8th Cir. 1995) (stating that "[t]he fact that [plaintiffs] were plan

participants in the past is irrelevant"); *Harris v. Provident Life & Accident Ins. Co.*, 26 F.3d 930,

933 (9th Cir. 1994 (noting that "[w]hether a person is a plan participant must be decided at the

time of the filing of the suit"); *Raymond v. Mobile Oil Corp.*, 983 F.2d 1528, 1534-35 (10th Cir.

1993) (stating that "current participant status is the relevant test").  The Third Circuit, however,

has noted that "Congress intended the federal courts to construe [ERISA's] statutory standing

requirements broadly in order to facilitate enforcement of its remedial provisions."  *Leuthner v.

Blue Cross and Blue Shield of Northeastern Pennsylvania*, 454 F.3d 120, 129 (3rd Cir. 2006),

*cert. denied*, 127 S. Ct. 1260, 167 L. Ed. 2d 75 (2007).  ERISA's legislative history reveals that

"the intent of the Committee [was] to provide the full range of legal and equitable remedies

available in both state and federal courts and to remove jurisdictional and procedural obstacles

which in the past appear to have hampered effective enforcement of fiduciary responsibilities

under state law or recovery of benefits due to participants."  *Id.* (quoting S. Rep. No. 127, 93d

Cong., 2d Sess., 3 (1974), *reprinted in* 1974 U.S.C.C.A.N. 4639, 4871).

     Statutory standing under ERISA is narrow; it is limited to a discrete number of parties

listed in the statute: a participant, beneficiary, fiduciary, or the Secretary of Labor.  29 U.S.C. §

1132(a).  Under ERISA's civil enforcement provision, a participant may bring a civil action "to

recover benefits due to him under the terms of his plan, to enforce his rights under the terms of

6

the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. §

1132(a)(1)(B).  ERSIA defines "participant" as "any employee or former employee of an

employer . . . who is or may become eligible to receive a benefit of any type from an employee

benefit plan which covers employees of such employer." 29 U.S.C. § 1002(7).  The Supreme

Court has interpreted this statutory definition of "participant" to include "former employees who

'have . . . a reasonable expectation of returning to covered employment, or who have 'a colorable

claim' to vested benefits.  *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 117, 109 S. Ct.

948, 958, 103 L. Ed. 2d 80 (quoting *Kuntz v. Reese*, 785 F.2d 1410, 1411 (9th Cir. 1986) (*per

curiam*)).  The Supreme Court further explained that "to establish that he or she 'may become

eligible' for benefits, a claimant must have a colorable claim that (1) he or she will prevail in a

suit for benefits, or that (2) eligibility requirements will be fulfilled in the future." *Id.* at 117-18,

109 S. Ct. at 958.

Thus, under the limited categories of ERISA standing, Ms. Ruggiero must qualify as a

plan participant under ERISA to have standing to bring this claim.  29 U.S.C. §§ 1002(7),

1132(a).  Because Ms. Ruggiero has no reasonable expectation of returning to covered

employment with US Airways due to her termination by Inflight Services, she must, as a former

employee, demonstrate that she has a "'colorable claim' to vested benefits." *Firestone*, 489 U.S.

at 117, 109 S. Ct. at 958 (internal citations omitted).  Ms. Ruggiero's burden of proving a

colorable claim to vested benefits is not a stringent one.  "A claim is colorable if it is arguable

and nonfrivolous, whether or not it would succeed on the merits." *Davis v. Featherstone*, 97

F.3d 734, 737-38 (4th Cir. 1996) (citing *Kennedy v. Connecticut General Life Ins.*, 924 F.3d 698,

700-01 (7th Cir. 1991)); *see also Sedlack v. Braswell Servs. Group, Inc.*, 134 F.3d 219 (4th Cir.

7

1998) (finding that former employee had a colorable, nonfrivolous collateral estoppel claim

against employer even though employee's claim for benefits was ultimately unsuccessful).

In *Davis*, the Fourth Circuit considered whether a former employee had a colorable claim

for benefit eligibility and thus qualified as a participant for ERISA standing.  *Davis*, 97 F. 3d at

737-38.  Davis, a former employee of Baltimore Gas and Electric who was injured on the job,

sued for penalties under his employer's disability plan when the administrator failed to provide

him with plan documentation that he had requested.  *Id.* at 735-36.  Applying the *Firestone*

analysis to determine whether Davis had a colorable claim, the Fourth Circuit found that, while

Davis's claim might ultimately fail, "it was colorable when he made his request for information."

*Id.* at 738.  Davis had met the first two requirements for eligibility for disability benefits under

his employer's plan and, although a final decision had not been made as to whether he was

disabled, Davis might have satisfied the final eligibility requirement because he was injured on

the job and unable to work.  *Id.*  Davis had a colorable claim because he had an "arguable,

nonfrivolous claim of eligibility for benefits when he made his request for information."  *Id.*

Similarly, Ms. Ruggiero had demonstrated that she has a colorable claim to her disability

benefits.  Like Davis, she had an arguable, nonfrivolous claim of eligibility for disability benefits

when she was terminated.  In fact, Ms. Ruggiero was receiving disability benefits from 1999 to

2003.  Therefore, at the time of her termination, Ms. Ruggiero was eligible for disability

benefits.  Ms. Ruggiero's claim that US Airways wrongfully terminated her based on an

acknowledgment that may or may not be a part of the LTD plan is arguable and nonfrivolous.

Consequently, because Ms. Ruggiero is a former employee of US Airways with a colorable

claim to her disability benefits, she is a plan participant under *Firestone* and has standing to

8

bring this action.        In raising standing as a threshold issue, US Airways is putting the proverbial cart before the horse.  Its standing argument hinges on the plan's definition of participant.  Section 1.2 of the plan defines "participant" as "any [e]mployee who satisfies the eligibility requirements set forth in Article II of the [p]lan."  Article II states that "[a]n [e]mployee shall cease to be a [p]articipant in the [p]lan upon the date on which a [p]articipant ceases to be an [e]mployee . . . ."  USA/Ruggiero 013.  US Airways determined that Ms. Ruggiero ceased to be an employee when she was terminated for engaging in unapproved other employment, which was prohibited in the acknowledgment that she signed as part of her application for disability benefits.  US Airways's standing argument assumes that the acknowledgment is part of the plan.  Ms. Ruggiero takes the position that the language in the acknowledgment is not in the plan and is therefore unenforceable.  Ms. Ruggiero argues that US Airways cannot profit from its own wrongdoing by relying on language, which is not part of the LTD plan, as grounds for terminating her and then arguing that she has no standing to bring this claim because she ceased to be a participant in the LTD plan once she was no longer an employee.

        This court agrees.  US Airways cannot avoid the merits of this case by raising a standing issue and thus benefit from its retroactive termination of Ms. Ruggiero by relying on language in the Flight Attendant Agreement to terminate her employment and on the acknowledgment—which the court must decide was or was not a part of the plan—to defeat her right to judicial review.  Under the *Firestone* standard, Ms. Ruggiero has demonstrated that she has a colorable claim to her disability benefits and, therefore, has standing under ERISA as a plan participant to bring her claim.

III.

The parties dispute whether the application for disability benefits, which includes the

acknowledgment, is a governing plan document.  US Airways's position is that the application is

part of the LTD plan—not an amendment to it—and therefore a governing plan document.  Ms.

Ruggiero counters that the application is not part of the LTD plan because US Airways did not

adopt it under the plan's formal amendment procedures.  If the application and its

acknowledgment are governing plan documents, then US Airways was entitled to rely on the

acknowledgment in making its decision to terminate Ms. Ruggiero's disability benefits.

A.

ERISA requires that employee benefit plans "be established and maintained pursuant to a

written instrument."  29 U.S.C. § 1102(a)(1).  A plan fiduciary "shall discharge his duties with

respect to a plan solely in the interest of the participants and beneficiaries and . . . in accordance

with the documents and instruments governing the plan."  *Id.* at § 1104(a)(1)(D).

Neither the parties nor the court have found an on-point Fourth Circuit case that

addresses a similar factual scenario where an employee covered under an ERISA plan disputes

the employer's enforcement of a purported plan provision that is contained in an application for

benefits but not in the plan itself.  Written documents not labeled as "benefit plan" or the like

nevertheless may still be a governing part of an ERISA plan.  While ERISA requires that plans

be in writing, there is no formal requirement that the plan documents making up an employee

benefit plan be labeled as such.  *Horn v. Berdon, Inc. Defined Pension Benefit Plan*, 938 F.2d

125, 127 (9th Cir. 1991) (holding that board resolution, which was signed by directors of the

company who had the power to amend the plan, requiring that all surplus assets of the

10

company's pension plan be distributed to the plan's participants was a valid plan amendment

even though it was not labeled as such).

The Eleventh Circuit has developed the prevailing test for determining whether an

informal plan exists under ERISA.  A plan under ERISA is established "if from the surrounding

circumstances a reasonable person can ascertain the intended benefits, [the] class of

beneficiaries, the source of financing, and [the] procedures for receiving benefits."  *Donovan v.*

*Dillingham*, 688 F.2d 1367, 1372 (11th Cir. 1982).  The Fourth Circuit, along with several other

circuits, has adopted the *Donovan* four-part test.  *Elmore v. Cone Mills Corp.*, 23 F.3d 855 (4th

Cir. 1994) (en banc); *see also Grimo v. Blue Cross and Blue Shield of Vermont*, 899 F. Supp.

196, 201 n.4 (D. Vt. 1995) (collecting cases).

In *Donovan*, the Eleventh Circuit considered whether employers or unions that

subscribed to Union Insurance Trust (a multiple employer trust whose purpose was to allow

small employers to provide group health insurance to employees) to obtain group health

insurance policies had established employee benefit plans under ERISA.  *Donovan*, 688 F.2d at

1369-70, 73-75.  Applying the four-part test, the *Donovan* court found that the employers

subscribing to Union Insurance Trust had established employee welfare benefit plans.  *Id.* at

1375.  First, a reasonable person could ascertain that the intended benefit was health insurance

because the employers and unions bought health insurance from the trust.  Second, the intended

beneficiaries were the employees of the employers and unions, which was evident from the

participation agreements.  Third, the source of financing was evident from the employers' and

unions' subscriptions to the trust and purchase of health insurance.  Finally, the employers,

unions, beneficiaries, and Union Insurance Trust all looked to the group health insurance policy

11

and the insurer to ascertain the eligibility requirements for receiving benefits and all other terms

and conditions. *Id.* at 1374.

The Fourth Circuit adopted the *Donovan* test in *Elmore v. Cone Mills Corp.*, 23 F.3d 855

(4th Cir. 1994) (en banc).  In *Elmore*, senior management of Cone Mills decided to gain control

of the company with a leveraged buyout.  In response to employee concerns regarding the effect

that the leveraged buyout would have on their pension benefits, senior management sent the

employees letters explaining that the company had over-funded the existing retirement plan and

that the company was entitled to any surplus, but had agreed, if the buyout was successfully

concluded, to contribute the surplus to a new employee stock option plan ("ESOP").  *Id.* at 858-

59.  In addition to the letters, senior management made additional representations about the

ESOP by posting notices on bulletin boards, showing a video presentation, and providing a

proxy statement to the employees.  *Id.* at 859.  Once the leveraged buyout was approved, the

ESOP documents were executed, but they made no mention of the surplus from the pension plan.

Several employees sued when Cone Mills received the surplus but did not invest it in the ESOP

as senior management had represented that it would.  *Id.* at 860.  The Fourth Circuit followed

*Donovan* in deciding that the employer's representations constituted an informal ERISA plan.

Although the court recognized that the representations were not adopted according to

amendment procedures set forth in the formal plan documents, the court noted that "an informal

plan may exist independent of, and in addition to, a formal plan as long as the informal plan

[met] all of the elements outlined in *Donovan*. *Id.* at 861.  The Fourth Circuit held that the

representations met the first three *Donovan* elements, but failed the fourth element because the

"only way an employee could ascertain the procedures for obtaining benefits would be to refer to

12

the 1983 ESOP formal plan document."  *Id.* at 861-62.  The court concluded that the letters and

other representations were only preliminary statements of the company's intentions and were

neither part of the formal ESOP plan nor did they amount to an informal ERISA plan under

*Donovan*.  *Id.* at 862.

Relying on *Donovan* and *Elmore*, US Airways argues that the application for disability

benefits and the acknowledgment were a part of the LTD plan and thus constitute governing

documents.  First, the intended benefit—disability coverage—is identifiable from the title of the

application: "US Airways Flight Attendants' Long Term Disability Plan Application for Long

Term Disability Benefits."  Second, the intended beneficiaries—US Airways flight

attendants—are also identifiable from the application's title.  Third, a reasonable person could

ascertain that US Airways was the source of funding for the LTD plan because the title of the

application referred to the plan as the "US Airways Flight Attendant Long Term Disability

Plan."  With respect to the fourth prong of the *Donovan* test, US Airways argues that "it is

obvious that [Ms. Ruggiero] understood the procedure for receiving disability benefits, as she

completed the form to receive benefits and submitted it in accordance with the instructions on

the face of the document."  Pla.'s Mem. in Supp. of Cross-Mot. for Summ. J. on the Admin. R.,

25 (citing *Grimo v. Blue Cross and Blue Shield of Vermont*, 899 F. Supp. 196 (D. Vt. 1995)

(finding that "a reasonable person could easily ascertain through common knowledge and

through the plan brochures in [the president's] office that it was necessary to secure a claims

form from [the employer] and submit it to Blue Cross in order to receive benefits")).

The fundamental problem with US Airways's argument is that the *Donovan* test focuses

on determining whether an enforceable plan exists even though there may be no formal plan

documents.  That is simply not the case here.  The plan exists quite independently of the

application and acknowledgment.  Moreover, the section of the LTD plan addressing application

for benefits does not reference or include a copy of the application and acknowledgment upon

which US Airways now relies.  Nor for that matter does it require that a participant use a specific

form of application to be provided by the company when applying for disability benefits under

the plan.  It simply states in section 4.1 that the "[p]articipant shall make an application for

[b]enefits hereunder in writing to the [a]dministrator" and that "[s]uch application shall be

supported by documentation as requested by the [a]dministrator."  USA/Ruggiero 017.  The plan

provides no other instructions on how to apply for benefits other than this general statement in

section 4.1.  For all that appears in the plan, a participant could simply write a letter to US

Airways requesting disability benefits and provide whatever supporting documents the company

asked for to evaluate the request.

    US Airways has not cited, and the court's own research has not found, any case where a

benefits *application* was determined to be an informal ERISA *plan* using the *Donovan* test.  *See,*

*e.g., Grimo*, 899 F. Supp. at 198-202 (finding that group health insurance *plan* was an ERISA

plan under *Donovan*); *Randol v. Mid-West Nat'l Life Ins. Co.*, 987 F.2d 1547 (11th Cir. 1993)

(finding that group health insurance *policy* that employer helped to subsidize was an ERISA

employee welfare benefit plan under *Donovan*); *Deibler v. United Food and Commercial*, 973

F.2d 206 (3rd Cir. 1992) (applying *Donovan* and holding that a severance *policy* coupled with

the board's meeting minutes and an amendment to the policy constituted a plan under ERISA);

*Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410 (4th Cir. 1993) (holding that group insurance *policy*

obtained by employer was an informal ERISA plan under *Donovan*).

In analyzing whether a plan exists under ERISA under the *Donovan* test, courts

consistently recall Congress's intent that "coverage under [ERISA] be construed liberally to

provide the maximum degree of protection to working men and women."  *Deibler*, 973 F.2d at

209 (quoting S. Rep. No. 93-127 (1973), *reprinted in* 1974 U.S.C.C.A.N. 4639, 4854); *Williams*

*v. Wright*, 927 F.3d 1540, 1543 (11th Cir. 1991) (noting that Congress intended ERISA to be

broadly construed); *Grimo*, 899 F. Supp. at 201 (quoting legislative history as quoted by

*Deibler*).  The court therefore concludes that extending *Donovan*—which has been consistently

applied to *protect* employees from adverse employment actions regarding benefits by finding

that an informal plan exists under ERISA—to the present situation would not comport with

Congress's stated intent with respect to ERISA.  It is with this concern in mind that the court

declines to hold that the application and acknowledgment constitute an informal ERISA plan

under *Donovan*.

B.

US Airways argues that even if the application and acknowledgment do not by

themselves constitute an informal ERISA plan, they would at least qualify as an amendment to

the LTD plan.  The court does not agree.

Under ERISA, every employee benefit plan "shall . . . provide a procedure for amending

[the] plan, and for identifying the persons who have authority to amend the plan."  29 U.S.C. §

1102(b)(3).  ERISA demands strict adherence to the clear language of a plan.  *White v. Provident*

*Life & Accident Ins. Co.*, 114 F.3d 26, 28 (4th Cir. 1997) (citing 29 U.S.C. § 1102(a)(1) and

1102(b)(3)).  Courts have interpreted this provision to require that "any modification to a plan

must be implemented in conformity with the [plan's] formal amendment procedures and must be

15

in writing." *HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross*, 101 F.3d 1005, 1009 (4th Cir.

1996) (quoting *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 58 (4th Cir. 1992)); *Elmore*,

23 F.3d at 861 (holding that "only representations adopted in accordance with the amendment

procedures outlined in the formal plan documents will suffice to incorporate the promised

benefits into the plan); *see also Depenbrock v. CIGNA Corp.*, 389 F.3d 78, 81-83 (3rd Cir. 2004)

(holding that purported amendment to pension plan did not become effective until CEO executed

and formally adopted the written amendment despite company's announcement of proposed

amendment and CEO's subsequent conduct). The Fourth Circuit has also held that informal or

unauthorized modifications of plans are impermissible under ERISA. *Pizlo v. Bethlehem Steel

Corp.*, 884 F.2d 116, 120 (4th Cir. 1989).

The LTD plan in this case does contain a formal provision for amendment. Specifically,

Section 8.1 provides that "[t]he [e]mployer may at any time, and from time to time, amend the

[p]lan, either prospectively or retroactively; provided, however, that any such amendment may

not cut back, alter or modify any rights provided for in the [a]greement. Any such amendment

shall be by written instrument *executed by an officer of the [e]mployer*." USA/Ruggiero 024

(emphasis added). The application and acknowledgment bear no indication that they are formal

amendments to the LTD plan. Unlike two amendments that are attached at the back of the plan,

neither the application nor acknowledgment is labeled as an amendment to the LTD plan nor do

they have an execution page signed by an officer of US Airways with an attestation signature.

USA/Ruggiero 027-033. Neither the application nor the acknowledgment were adopted as

amendments to the LTD plan under the plan's formal amendment procedures and, consequently,

the acknowledgment cannot be considered part of the LTD plan.

16

C.

Even though the application for disability benefits and the accompanying

acknowledgment do not qualify either as an informal employee benefits plan or an amendment to

the formal plan, that does not necessarily make the acknowledgment irrelevant to the present

dispute.  With certain exceptions,[5] benefits under the LTD plan are payable only so long as a

participant remains an employee of the company.  USA/Ruggiero, 013.  If, therefore, US

Airways had the right to terminate Ms. Ruggiero's employment based on some agreement or

provision outside the plan, her right to continue receiving benefits would terminate with her

employment.  The question, then, is whether US Airways was entitled to terminate her

employment based on her working as a massage therapist and paralegal without permission from

the company while on disability leave; whether she was given fair notice of the restriction; and

whether she violated it.  Under Section 20.J.3 of the US Airways Flight Attendant Agreement,

"[a] flight attendant who, without prior permission of the [c]ompany, engages in *other*

*employment* while on a leave of absence shall be deemed to have resigned and his/her name shall

be removed from the System Seniority List."  USA/Ruggiero, 043 (emphasis added).  The

acknowledgment contained on the reverse side of the application for disability benefits contained

similar language: "If found engaged in *other employment* without prior permission of US

---

[5]  The exceptions are (1) for a participant who is receiving benefits "and subsequently ceases to
be an Employee as a result of transferring directly from active or on-leave payroll status to
pension benefit commencement" and (2) for a participant "who is determined to be totally and
permanently disabled by the Social Security Administration and who is receiving Benefits [under
the LTD plan] and subsequently ceases to be an employee as a result of furlough by the
[company]."  Ms. Ruggiero does not contend that either exception would apply to her.

Airways, I understand that I will be deemed to have resigned from the [c]ompany."

USA/Ruggiero, 005.01 (emphasis added).

Ms. Ruggiero does not dispute that she read the acknowledgment or that it is her signature at the bottom of the acknowledgment.  Ms. Ruggiero does claim, however, that the language was ambiguous and that she interpreted the approval requirement to apply to outside employment commencing post-disability, not to the continuance of pre-disability outside employment.  The court fails to see how the words "other employment" are ambiguous.  The term "other" is all-encompassing and fairly embraces any employment, whether or not it represents a career change or simply the continuation of a pre-disability second job.  It is easy to see why an employer would have a requirement that employees seek approval before engaging in other employment while on disability leave.  In addition to preventing employees from abusing the disability benefit system, employers have a legitimate interest in seeing that their disabled employees recover and return to full-time employment.  It is by no means unreasonable that US Airways would want to monitor a disabled employee's recovery to ensure that the employee is healing and on the road to returning to full-time employment.  To that end, it is reasonable for US Airways to require that employees secure its approval before engaging in other employment, whether begun pre- or post-disability, to ensure that the disabled employee is not engaging in any type of work that will exacerbate an injury or slow the recovery process.

Accordingly, the court concludes that even though the acknowledgment was neither an informal plan nor an amendment to the LTD plan, the acknowledgment provided fair notice to Ms. Ruggiero of the limitation on outside employment contained in section 20.J.3 of the Flight Attendant Agreement.  Once Inflight Services—after giving Ms. Ruggiero an opportunity to

18

explain—determined that Ms. Ruggiero had violated the provisions of Section 20.J.3, it terminated her employment.  Based on that termination, the LTD plan administrator was required to terminate Ms. Ruggiero's disability benefits.  Section 1.2 of the LTD plan defines a participant as "any [e]mployee who satisfies the eligibility requirements set forth in Article II of the [p]lan."  USA/Ruggiero, 011.  The plan goes on to define an employee as "any individual in the employ of the [e]mployer who is classified by the [e]mployer as a flight attendant, who is represented by the Association of Flight Attendants and who is in active status or on an [e]mployer-approved leave of absence."  USA/Ruggiero, 011.  By definition, once her employment was terminated, she was no longer "an individual in the employ" of US Airways.  Therefore, as least as of November 4, 2003—the date of the letter terminating Ms. Ruggiero's employment—US Airways had justifiable grounds for terminating her disability benefits.

D.

The more difficult question is whether, in November 2003, US Airways could retroactively terminate those benefits as of September 12, 1999, based on the purported retroactive termination of employment.  The court concludes that it could not.

The LTD plan itself simply provides that an employee "shall cease to be a Participant in the Plan upon the date on which the Participant ceases to be an employee."  at USA/Ruggiero 013.  The language "shall cease" fairly implies immediate, not retroactive, operation.  Indeed, nothing in the LTD plan suggests there could be such a thing as retroactive termination of benefits, nor does the plan set forth any right to recover benefits paid before a determination that employment has ceased.  More importantly—since in this case the right to terminate benefits is entirely dependent upon the termination of employment—the term "retroactive" or any variation

19

of it is starkly absent from section 20.J.3 of the Flight Attendant Agreement upon which US

Airways relies.  It simply states:

> A flight attendant who, without prior permission of the Company, engages in
> other employment while on a leave of absence shall be deemed to have to have
> resigned and his/her name shall be removed from the System Seniority List.

A retroactive deprivation of status or rights would be an unusual and surprising event and one,

that if intended, should have been clearly and expressly set forth.  Certainly, it is not the sort of

term that a court will imply from silence.

It is true that the acknowledgment signed by Ms. Ruggiero, while it lacks language

expressly stating that termination of employment would be retroactive if she were "found

engaged in other employment without prior permission of US Airways," is arguably consistent

with such a notion because it also states, "All funds previously paid to me for disability, while I

was engaged in outside employment, will be restored to US Airways immediately."

USA/Ruggiero 005.01.  Since, however, the court has already determined that the

acknowledgment constitutes neither an informal ERISA plan nor an amendment to the LTD

plan, the acknowledgment cannot serve to create rights or remedies but only to give notice of

those provided for in the LTD plan or the Flight Attendant Agreement.  Because the Flight

Attendant Agreement does not clearly allow retroactive termination of employment and because

the LTD plan does not clearly allow retroactive termination of benefits, the court concludes that

any termination of benefits was effective only as of November 4, 2003, the date Ms. Ruggiero

was notified that her employment was terminated.  Accordingly, US Airways is not entitled,

based on a theory of retroactive termination, to be reimbursed for the $79,941.90 in disability

benefits that it paid Ms. Ruggiero from 1999 to 2003.

20

E.

As an alternative to its theory of retroactive termination, US Airways urges that

reimbursement of the $79,941.90 in disability benefits it paid to Ms. Ruggiero should be granted

on equitable grounds.  Specifically, US Airways argues that the its reimbursement claim falls

within the type of equitable relief that the Supreme Court approved in *Sereboff v. Mid Atlantic*

*Medical Servs., Inc.*,  126 S. Ct. 1869, 164 L. Ed. 2d 612 (2006).  US Airways concedes that its

breach of contract claim is superceded by ERISA.  Mem. in Opposition to

Defendant/Counterplaintiff Dorothy Ruggiero's Mem. in Support of Mot. for Judgment on the

Admin. Rec. n.6.  Under *Sereboff* US Airways must identify the particular fund or property in

Ms. Ruggiero's possession that it seeks to recover.  126 S. Ct. at 1974 (holding that Mid Atlantic

properly identified "'specifically identifiable' funds that were 'within the possession and control

of the Sereboffs'" where the Sereboffs had set aside portion of tort settlement proceeds received

from third party pending resolution of Mid Atlantic's reimbursement claim for medical expenses)

(quoting *Mid Atlantic Medical Servs., LLC v. Sereboff*, 407 F.3d 212, 218 (4th Cir. 2005))).  In

finding that relief was properly sought by Mid Atlantic, it was critical to the Supreme Court that

Mid Atlantic sought recovery by imposing a constructive trust on specifically identifiable funds

rather than from the Sereboffs' assets generally.  *Id.*

The only "fund" US Airways attempts to identify is by referring to language in the

acknowledgment that provided "all funds previously paid to me for disability" rather than an

actual account or trust in Ms. Ruggiero's possession.  This analysis misses the point the *Sereboff*

court was making in distinguishing *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S.

204, 112 S. Ct. 708, 151 L. Ed. 2d 635 (2002).  Mid Atlantic sought to recover from a

21

specifically identifiable fund in *Sereboff*—the settlement proceeds that the Sereboffs set aside—whereas Great-West sought funds that were not in defendant Knudson's possession. *Sereboff*, 126 S. Ct. at 1874 (citing Great West, 534 U.S. at 214).  For restitution to be an equitable remedy, the plaintiff must identify the particular funds or property within the defendant's possession. *Great West*, 534 U.S. at 213.  The Supreme Court further explained that, where the property or its proceeds that the plaintiff seeks to recover "'have been dissipated so that no product remains, [the plaintiff's] claim is only that of a general creditor, and the plaintiff 'cannot enforce a constructive trust of or an equitable lien upon other property of the [defendant].'" *Id.* at 213-14 (quoting Restatement of Restitution § 215, cmt. a, at p. 867 (1936)). The Court went on to explain, "[F]or restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession."  *Id.* at 214.

Ms. Ruggiero has filed a declaration stating that she has spent the disability benefits that she received on living expenses for her and her daughter and that none of the benefits remain in her possession.  Because no specific funds in her possession have been identified, any liability imposed on her for restitution would require imposing general personal liability on her—a remedy at law—for the $79,941.90 in disability benefits that she received.  Such a remedy is not authorized by section 1132(a)(3) of ERISA.  Consequently, there are no specifically identifiable disability benefit proceeds that US Airways can point to in order to retroactively recover the benefits it paid Ms. Ruggiero prior to her termination.

IV.

In summary, the court finds the following: (1) Ms. Ruggiero has standing under ERISA

to bring her claim against US Airways; (2) the acknowledgment on the back of the application

for disability benefits is not an amendment to the plan nor is it a part of an informal ERISA plan

under *Donovan* and, therefore, US Airways was not entitled to rely on it as the basis for

terminating Ms. Ruggiero's disability benefits; (3) US Airways was, however, entitled to rely on

Section 20.J.3 of the Flight Attendant Agreement in deciding to terminate Ms. Ruggiero's

employment, which in turn required the LTD plan administrator to terminate her disability

benefits under the LTD plan; and (4) US Airways is not entitled to reimbursement for the

$79,941.90 in disability benefits that it paid to Ms. Ruggiero from 1999 until 2003 when she was

terminated by Inflight Services.

A separate judgment will be entered disallowing Ms. Ruggiero's claim (Claim No. 2753)

against US Airways for $486,337.49 in disability benefits and dismissing US Airways's

counterclaim for recovery of the $79,941.90 in disability benefits disability benefits paid prior to

the termination of Ms. Ruggiero's employment.


Date: _____          _____
                                    Stephen S. Mitchell
Alexandria, Virginia                United States Bankruptcy Judge

23

Copies to:

Amy Morrissey Turk, Esquire
McGuireWoods LLP
9000 World Trade Center
101 West Main Street
Norfolk, VA 23510
Counsel for the reorganized debtor/plaintiff

Christopher S. Moffitt, Esquire
218 North Lee Street, 3rd Floor
Alexandria, VA 22314-2361
Counsel for the claimant/defendant

Ian O. Smith, Esquire
Moukawsher & Walsh, LLC
21 Oak Street, Suite 209
Hartford, CT 06106
Counsel for the claimant/defendant

Malcolm Mitchell, Esquire
Vorys, Sater, Seymour & Pease, L.L.P.
277 South Washington Street, Suite 310
Alexandria, VA 22314
Counsel for the Official Committee of Unsecured Creditors

Dennis Early, Esquire
Assistant United States Trustee
115 South Union Street, Suite 210
Alexandria, VA 22314